[666 NYS2d 572]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GARY
OVERLEE, Appellant.

First Department, December 4, 1997

### APPEARANCES OF COUNSEL

*Julie E. Steiner* of counsel *(Richard M. Greenberg* and *Dewey Ballantine,* attorneys), for appellant.

*Michael S. Morgan* of counsel *(Ellen Sue Handman* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

### OPINION OF THE COURT

SULLIVAN, J. P.

On this appeal from his conviction of assault in the second degree, criminal trespass in the second degree and resisting arrest, defendant raises a host of prosecutorial misconduct claims, including, *inter alia,* compelling him to characterize the People's witnesses as liars; characterizing him as a liar; bolstering the credibility of prosecution witnesses and repeatedly injecting into the case the prosecutor's own personal opinion as to defendant's guilt and his own theories as to the facts.

Briefly stated, the People's evidence showed that on the morning of April 24, 1992, as Jerry Santana, an off-duty New York City Housing Authority police officer, was leaving his apartment on the top floor of his Lexington Avenue apartment building, he found defendant sleeping on the interior roof landing. After identifying himself as a police officer, Santana asked defendant, who he knew did not live in the building, to leave. Agitated and belligerent, defendant refused. Santana immediately returned to his apartment and called the local

precinct, identifying himself as an off-duty Housing Authority police officer, and asked for police assistance in removing the intruder from the building.

When Santana returned to the roof landing, he informed defendant, who was still lying down, that he had to leave and that the police had been called. After expressing his disdain for both Santana and the police, defendant grabbed Santana around the waist, picked him up and tried to throw him down the stairway. Santana responded by grabbing defendant around the neck and hitting him. At that point, several police officers arrived to see the two men struggling. Santana was pinned against the landing's bannister as defendant was grabbing him by the leg and lifting him off the ground. Santana, in turn, was clinging to defendant's torso to keep from being thrown over the railing. After a struggle with one of the police officers, defendant ultimately fell to the floor, face first, with the officer and Santana landing on top of him. As a result of the fall, Santana suffered a fracture of his right pinky finger. Defendant continued to struggle, hitting the officer who was trying to handcuff him. Even after he was handcuffed following a "long struggle", defendant kept kicking at the officers. Despite his continuing struggle, the officers removed defendant from the building. He was then taken to a hospital for medical treatment of a cut over his left eye, which was bleeding, sustained when his head struck the tile floor. One of the police officers was also injured, suffering a bruised left knee and dislocated thumb. Both Santana and the injured police officer were taken to the same hospital for treatment.

Defendant, taking the stand in his own behalf, testified that he was a resident of apartment No. 18 in the same building and that he had fallen asleep on the inside roof landing at about 6:15 A.M. on his return from the roof, where he had gone to watch the sunrise. He had been awake for the past 20 hours working at his job and, later, helping a friend repair a truck. When defendant awoke, he testified, Santana was standing over him, kicking him as he held a large Rottweiler dog by its collar. Eventually, after defendant had stood up, Santana grabbed him and spun him around, causing him to fall, face first, to the ground and to sustain a cut to his hand. When the police arrived defendant and Santana were still struggling. Defendant told the officers that he lived in apartment No. 18 but they beat him nonetheless. Thus, defendant claimed he was the victim of an unjustified assault by Santana and the responding police officers.

Defendant does not challenge the sufficiency of the evidence, which was more than enough to prove his guilt of the three charges against him. Rather, he asserts, the prosecutor, during his cross-examination and again in summation, "maliciously denigrated [him] in the eyes of the jury", "relentlessly chalieng[ed him] to characterize the People's witnesses as liars" and repeatedly engaged in inappropriate trial tactics. In defendant's view, the totality of these improper tactics requires reversal. In advancing this argument, defendant takes selected portions of the record, often out of context, and argues, in essence, that any question or comment designed to discredit his testimony constitutes prosecutorial misconduct. As defendant must concede, however, he did not object to all of the cited alleged improprieties. Thus, most of his claims have not been preserved for appellate review. (See, CPL 470.05 [2].)

In his testimony, defendant attempted to portray himself as a hardworking, law-abiding citizen who, virtually collapsing from fatigue on the interior roof landing of his building after working, in effect, a double shift into the early hours of the morning, met up with Santana, a mean-spirited off-duty police officer, who unjustly attacked him. He was thereafter brutalized, he claims, by the responding police officers, who subsequently arrested him. Given such a portrayal, the prosecutor had the right to subject defendant to vigorous cross-examination and to attack his version of the facts in summation.

Once a defendant testifies and places his credibility in issue, a prosecutor need not tread lightly in cross-examining him or arguing his case to the jury. The prosecutor must not, of course, stray from the record evidence or relevant issues. As an advocate, he is permitted, within the discretionary limits imposed by the trial court (see, People v Duffy, 36 NY2d 258, 262-263), to cross-examine a defendant "as forcefully as possible" (People v Adams, 21 NY2d 397, 402). He is similarly afforded wide latitude in his summation. (See, People v Galloway, 54 NY2d 396, 399.) In assessing the propriety of a prosecutor's cross-examination or summation, the arguments raised by the defendant must be taken into account since the prosecutor has the right to respond. (See, People v Morgan, 66 NY2d 255, 259.) Hence, the issue before us, considering the claims on the merits, notwithstanding, for the most part, the lack of preservation, is whether, either in cross-examination or summation, the prosecutor's conduct was so egregious as to have deprived defendant of a fair trial. Viewed in the light of these stan-

dards, the prosecutor's conduct never exceeded the bounds of permissible advocacy.

In his testimony, defendant offered a factual version entirely at odds with that of the People's witnesses, most notably Santana and Officer Delgado, one of the responding officers. When defendant's counsel asked defendant to explain certain discrepancies, defendant answered by saying that "Officer Santana is a liar." On cross-examination, the prosecutor, not unexpectedly, also asked defendant about the differences between his and the prosecution's account of the incident.

"Q. Isn't it true a month prior you kicked in the door to gain entry?

"A. Absolutely not.

"Q. So when Officer Santana says that he saw you do that, he's lying?

"A. He's basically, a liar. I found that out by his testimony.

"Q. I'm sorry, I didn't mean to interrupt. According to your testimony everyone is a liar?

"A. No, I didn't say everybody is a liar.

"Q. Well, these police officers are liars?

"A. No, not all the police officers are liars. I said two of them lied, that's what I said.

"All right, and I actually only accused one of them. But if you want to get into it, there was two, Delgado lied. But I didn't say Fuentes lied about anything. He was actually about as honest about the situation as what he saw, but not the other two.

"Q. So, its your testimony that Delgado is a liar?

"A. He definitely is a liar because he wasn't the first one up there. And in fact, he says that he knew that one was a police officer and one of us was not. Well, the call that they had on the radio said that he was a — that I was —. * * *

"Q. Mr. Overlee, answering yes or no, was Officer Santana a liar when he testified here?

"A. Was Officer Santana a liar when he testified here?

"Q. Yes.

"A. Yes.

"Q. Was Officer James Delgado a liar when he testified here?

"A. Yes, he lied. * * *

"Q. Did you hear Officer Fuentes say he was going to get you out of the building and get you medical help?

"A. He was trying to get me out of the building to arrest me, he was not trying to get me medical help. He was arresting me, that was his primary concern. He was arresting me, he was not taking me for medical help. * * *

"He kind of was exaggerating his position, that's why I said that he basically told the truth. But he's in a funny position when he had two police officers lying and he's telling the truth, it puts him in a bad light. * * *

"Q. Yes, it's fair to say that Police Officer Fuentes did not tell the whole truth, is that correct?

"A. I think that he tells the truth as he remembers it, but I don't think that he remembers it as clearly as I do, that's for sure. * * *

"Q. So, Officer Fuentes was not telling the whole truth, correct?

"A. I can't state to that, I can't say whether he's telling the whole truth or not.

"Q. But in any event, you can state that at least two of the officers are lying?

"A. Yes, absolutely."

On redirect examination, at counsel's request to "tell the jury what was true versus what was false", defendant recounted his version of the incident and again accused Santana of lying and Delgado of being inaccurate. In re-cross-examination, the prosecutor, on the basis of defendant's repeated effort to portray Officers Santana and Delgado as having lied, properly asked, "It's your testimony here that everyone is a liar but you?" Defendant answered that that was not his testimony.

Defendant argues that the prosecutor improperly challenged him to characterize the People's witnesses as liars. As with most of the claims asserted, defense counsel never raised an objection to this line of questioning and the issue is unpreserved. (See, CPL 470.05 [2].) Nor is there any merit to the argument. While this Court has cautioned prosecutors to avoid goading a testifying defendant into characterizing the People's witnesses as liars, especially when the defendant, by his testimony, has not impugned the truthfulness of those witnesses (see, e.g., People v Ortiz, 207 AD2d 279, 280, lv denied 84 NY2d 909; People v Robertson, 192 AD2d 447, lv denied 82 NY2d 725; People v Butler, 185 AD2d 141, 142; People v Garcia, 169 AD2d 358, 364, lv denied 79 NY2d 857), such conduct does not always require reversal (see, People v Bryant, 60 AD2d 810, appeal dismissed 44 NY2d 790).

More to the point though, a distinction has to be made between a defendant's testimony that conflicts with that of the People's witnesses and yet is susceptible to the suggestion that the witnesses spoke out of mistake or hazy recollection and the situation where, as here, the defendant's testimony leaves open only the suggestion that the People's witnesses have lied. In the latter circumstance, the prosecution has the right to ask whether the witnesses are liars. Here, defendant testified that Santana and the other officers attacked him. The prosecution witnesses testified to defendant's assault of Santana and the other officers. The contradictory accounts cannot be based on mistake or hazy recollection. Indeed, defendant himself volunteered that both Officers Santana and Delgado were liars. In such circumstances, the prosecutor was well within his rights in asking defendant whether those witnesses had lied. Of course, in any case of direct conflict between a defendant's testimony and that of a People's witness, the prosecutor is entitled to ask the defendant whether the witness had been mistaken in his testimony (*see, People v Ortiz*, 165 AD2d 766, 767, *lv denied* 77 NY2d 998) and, for that matter, whether the witness's testimony was not true (*People v Spencer*, 226 AD2d 160, *lv denied* 88 NY2d 995). Thus, the prosecutor quite properly asked defendant whether Officer Fuentes had not told "the whole truth".

While the courts have generally frowned upon the use of the word "liar" or any derivative of "lie" in the cross-examination of a defendant with respect to the credibility of prosecution witnesses, the rationale for such a proscription is rarely explicated. (*See, e.g., People v Galloway*, supra, 54 NY2d, at 400, citing *People v Rodriguez*, 62 AD2d 929; *People v Bryant*, 60 AD2d 810, *supra* [neither of which offered a rationale for the impropriety of such questioning]; *People v Ortiz*, 165 AD2d 766, 767, *lv denied* 77 NY2d 998, *supra; People v Butler*, 185 AD2d 141, 144, citing *People v Jones*, 74 AD2d 854, 856-857 [2d Dept]; *People v Garcia*, 169 AD2d 358, 364, *lv denied* 79 NY2d 857, *supra.*) In *People v Ortiz* (207 AD2d 279, *supra)*, this Court cited the prosecutor's questioning of the defendant as to discrepancies between his testimony and that of the People's witnesses and described the prosecutor's effort to have the defendant characterize police testimony as lies as "particularly egregious." (*Supra,* at 280.) The Court justified its ruling on the ground that the defendant "had no burden to prove that the police witnesses were lying, and any inference created to that effect merely deflected the jury's attention from the real is-

sue—the sufficiency of the People's circumstantial evidence as against defendant's innocent bystander explanation" (*supra,* at 280). Most respectfully, such questioning in no way signifies a shifting of the burden of proof. In a situation where a defendant flatly denies the occurrence of events and his involvement in those events, as testified to by the People's witnesses in circumstances that exclude the possibility that the prosecution's witnesses may have been mistaken or testified to events based on assumptions or a faulty memory, the defendant has created a credibility contest. Under our adversarial system, the just resolution of competing factual claims, which turn on issues of credibility, depends, in large measure, on the testing for truth. (*People v Galloway, supra,* 54 NY2d, at 398.) A prosecutor, as with any advocate, may, provided he does not stray from the record or inject irrelevant issues, cross-examine a defendant as vigorously as possible. (*People v Adams, supra,* 21 NY2d, at 402.) Consistent with that right, the prosecutor may, where a direct contradiction not attributable to mistake, assumption or faulty memory exists between a defendant's testimony and that of a prosecution witness, ask a defendant whether that witness has lied or is a liar. Finally, we note, in circumstances where, as here, defendant was the first to inject the word "liar" into the trial, he ought not be heard to complain when the prosecutor also utilizes such terminology. (*See, People v Haywood,* 212 AD2d 386, 386-387, *lv denied* 85 NY2d 939.)

Defendant also cites as an impropriety the prosecutor's asking him on cross-examination, "[D]o you have trouble with the police and doctors?" This error, he argues, was compounded when, during summation, the prosecutor remarked that defendant "has a problem with doctors, because he has trouble with all authority figures." No objection was taken to the question or summation comment. Aside from portraying himself as a victim of official harassment and police brutality as well as medical mistreatment, defendant expressed his animosity towards the police officers involved, testifying that "Officer Santana is a liar"; that "[Santana] was [an] animal" and that the other officers had sadistically tortured him. When the prosecutor asked defendant if he had received medical treatment as a result of the incident, he began to rail against the hospital, claiming that its medical employees were incompetent. Against such a background, the prosecutor was entitled to explore whether defendant's testimony might have been affected by his animosity towards those persons and to comment thereon in his summation. Such animosity would, of course, be

relevant on an assessment of defendant's credibility. Thus, the inquiry and comment on the subject were appropriate.

Defendant contends, although the issue is unpreserved, that the prosecutor improperly asked him if he "liked to talk", "to mouth off" and whether he had told Santana "to * * * himself", an impropriety purportedly compounded by the prosecutor in summation when he made similar comments. The trial court, *sua sponte*, admonished the prosecutor that the "like to talk" comment was improper. No further corrective action was requested and defendant may not, at this stage, complain about the court's response. (*See, People v Ardale*, 173 AD2d 307, 307-308, *lv denied* 78 NY2d 961.)

In any event, the prosecutor's conduct was not improper. In his testimony defendant blamed the incident on Santana, who was angered by defendant's response, on being asked to leave the roof landing, that it would take him a "minute" because his back had "locked up". This account was in direct conflict with the testimony of Santana that, after he had asked defendant to leave, defendant responded, "* * * you." According to Santana, defendant repeated that expletive after learning that the police were on their way. In such circumstances, the prosecutor could ask defendant if he had a tendency to "mouth off" and to comment on that subject in summation. And, especially since defendant had accused Santana of being a "liar", the prosecutor was entitled to question him about the conflicts between their respective accounts (*see, People v Spencer*, 226 AD2d 160, *supra)* and to argue in support of Santana's credibility in summation. Moreover, in light of defendant's testimony on direct examination that, after their initial encounter, he told Santana to "get the * * * out of here and get the police", his complaint about the prosecutor's questioning him about the use of that expletive rings hollow.

Defendant also cites the prosecutor's questioning of him about his criminal background. On direct examination, defendant admitted that he had been convicted of a felony drug offense in 1988 but claimed he had a change of heart about selling drugs "after seeing children on drugs." In light of such professed concern, the prosecutor asked him whether it was "possible that children might have ended up with drugs that anyone sold in 1988?" The court sustained defense counsel's objection, struck defendant's answer and instructed the jury to "disregard the response". Defendant argues that this question inflamed the jury against him, impairing his right to a fair trial. Since, however, defendant's objection was sustained and

the answer stricken, and defense counsel failed to ask for any curative measures other than those which the court undertook, his present claim is unpreserved. (*See,* CPL 470.05 [2]; *People v Ardale, supra,* 173 AD2d, at 307-308.)

In any event, there is no merit to defendant's argument. As noted, the trial court sustained defendant's objection to the line of inquiry about his concern about the effect of drugs on children and struck his answer. Later, in its charge, the court instructed the jury to "disregard entirely unanswered questions and stricken testimony." Any taint or prejudice from the inquiry would have been ameliorated, given the court's instruction, which the jury is presumed to have followed. (*See, People v Davis,* 58 NY2d 1102, 1104.)

Defendant also complains of the prosecutor's use of snide remarks in an effort to portray him as a liar. The use of sarcasm is, of course, a well-recognized device to illustrate the inherent implausibility of a witness's testimony. Except for one ill-advised barb about Lorena Bobbitt, who had achieved a measure of notoriety by mutilating her husband, the comments, concededly sarcastic, amounted to fair questioning as to the details of defendant's testimony. As soon as the Bobbitt question was asked, the court, *sua sponte,* admonished the prosecutor that it was improper and instructed the jury to disregard it. And, tellingly, defendant's failure to object to any of the questions is perhaps the best indication of the absence of any real prejudice.

Defendant argues that the prosecutor's comments during cross-examination and summation improperly shifted the burden of proof. Specifically, he challenges the prosecutor's inquiry as to whether he had any documentation, a bill or a written statement from his alleged roommate, for example, to corroborate his testimony that he was a resident of apartment No. 18, the address in question, and whether he had ever filed a civilian complaint against the officers who had allegedly brutalized him. These deficiencies were also pointed out by the prosecutor in summation. No objection was noted either in cross-examination or summation and, thus, the claim is unpreserved.

In any event, the claim is meritless. Although defendant made his residency at the Lexington Avenue address in question the linchpin of his defense to the trespassing charge, he argues that he had "absolutely no duty to produce evidence supporting his version of events." Be that as it may, the prosecutor was entitled to ask him whether he had any inde-

pendent evidence of an apartment No. 18 residency and to point out in summation the lack of any evidence to corroborate defendant's claim. (*See, People v Gathers*, 207 AD2d 751, 752, *lv denied* 84 NY2d 1031.) When a defendant chooses to present affirmative proof, his failure to produce supportive evidence, especially where such proof would ordinarily be available, may be brought to the jury's attention. (*People v Nai Hing Liang*, 208 AD2d 401, 402.)

Thus, there was no impropriety in asking defendant whether he had a statement from his roommate at the Lexington Avenue address, especially since defendant never called the roommate to testify. Similarly, in light of defendant's claim of police brutality, the prosecutor appropriately asked him whether he had reported the incident to the authorities. Since this line of inquiry was relevant to an assessment of defendant's credibility, the prosecutor, on summation, could rightfully remind the jury that defendant had failed to make such a report. (*Cf., People v Rice*, 75 NY2d 929.)

Despite defendant's arguments to the contrary, the prosecutor's summation fell well within the bounds of permissible rhetorical comment. Again, defendant failed to object to those aspects of the prosecutor's summation he now challenges. In arguing that the prosecutor exceeded the bounds of proper comment, defendant takes the position that any argument against his credibility is analogous to branding him a liar. Even though he offered testimony incompatible with that of the People's witnesses, and even though his counsel tried to explain away the contradictions by claiming the People's witnesses had been "lying", "exaggerating" or "mistaken" and by arguing that their testimony was "incredible", "absurd" and "fictitious", defendant argues that the prosecutor nevertheless was foreclosed from even suggesting to the jury that it might have been defendant, not the People's witnesses, who had testified falsely. The argument falls of its own weight.

It should be noted that at no point in his summation did the prosecutor ever brand defendant a "liar" or accuse him of "lying". (*See, e.g., People v Martin*, 172 AD2d 268; *People v Dowdell*, 88 AD2d 239.) The prohibition against such a label, however, does not preclude the use of a more tempered challenge to a defendant's credibility. A defendant cannot be heard to complain when a prosecutor attempts to cast aspersions on his testimony, provided he does so in a noninflammatory manner. (*People v Galloway, supra*, 54 NY2d, at 399.) That is precisely what the prosecutor did here. His argument consisted

of a measured response to defendant's claim that he, not the People's witness, had testified truthfully. Since the prosecutor was entitled to argue that defendant's testimony was incredible, defendant's claim, that by doing so, the prosecutor was acting as an unsworn witness, is meritless. (*See, People v Ortiz*, 217 AD2d 425.) Nor did the prosecutor vouch for the credibility of the People's witnesses. Faced with defense counsel's focused attack on their credibility, the prosecutor was clearly entitled to respond by arguing that the witnesses had, in fact, been credible. (*See, People v Salaman*, 231 AD2d 464, *lv denied* 89 NY2d 929.) An argument by counsel that his witnesses have testified truthfully is not vouching for their credibility.

In sum, there is nothing about defendant's unpreserved complaints with respect to the prosecutor's summation or his cross-examination of him to suggest that defendant was deprived of his right to a fair trial. We have examined defendant's other points and find them to be without merit.

Accordingly, the judgment of the Supreme Court, New York County (Mary McGowan Davis, J.), rendered March 17, 1994, convicting defendant, after a jury trial, of assault in the second degree, criminal trespass in the second degree and resisting arrest, and sentencing him, as a predicate felony offender to an indeterminate term of imprisonment of from two to four years on the assault conviction, and concurrent one-year terms on the trespass and resisting arrest convictions, should be affirmed.

ELLERIN, NARDELLI, WILLIAMS and ANDRIAS, JJ., concur.

Judgment, Supreme Court, New York County, rendered March 17, 1994, affirmed.